Ruffin, C. J.
 

 There can be no question, that a bequest of slaves for the purpose, or upon trust, to send them to another country, there to become and remain free, is
 
 *17
 
 valid. There is no ground, upon which-'the validity of such a bequest can be doubted. In the nature of things, the owner of a slave may renounce his ownership, and the slave will thereby be manumitted, and that natural right continues, until restrained 'by positive statutes. It was, indeed, early found in this State, as in most of the others, in which there is slavery, that the third class of free negroes was burdensome as a charge on the community, and,, from its general characteristics of idleness and dishonesty, a common nuisance.
 
 <
 
 Hence the legislative policy, with us, was opposed to emancipation, and restricted it to a particular mode and upon a special consideration — which was by license of the Court and for meritorious services. But that was purely a regulation of police, and for the promotion of the security and quiet of the people of this State. It sought only to guard against evils arising from free negroes residing here. Except for that purpose of policy, it was not intended to impose any restriction on the natural right of an owner to free his slaves. Emancipation was not prohibited for the sake merely of keeping persons in servitude in this State, and increasing the number of slaves, for the law never restrained* their exportation, either for the purpose of servitude abroad, or for that of emancipation there. On the contrary, all our legislative regulations had a reference exclusively to emancipation, within our limits, of slaves, who were intended to remain here. That was the ground of decision in the leading case of
 
 Haywood
 
 v.
 
 Craven, 2
 
 No. Ca. Law Repos. 557, and all the subsequent cases ; in not one of which did the deed or will direct that the emancipation should take effect abroad. It never has been disputed, that the owner could send his slaves away and emancipate them, where it was lawful for free men to live. This State laid no claim at any time to hold them here for the sake of their perpetual bondage. So far from it, by a m'odern statute, 1830, c. 9, the policy is avowed of encouraging emancipation, upon the sole con
 
 *18
 
 dition, that the people freed shall not disturb or be chargeable to us, but keep out of our borders. And in
 
 Cameron
 
 v.
 
 Commissioners of Raleigh,
 
 1 Ired. Eq. 436, and in
 
 Thompson
 
 v.
 
 Newlin,
 
 3 Ired. Eq. 338, the distinction is expressly-stated between a trust to remove slaves abroad, to be emancipated, and one to have them emancipated here or to hold them in a state of qualified servitude, nominally as the property of the trustee, but really for the benefit of Hie slaves themselves — holding the former trust lawful, but the latter unlawful. And the former case establishes, that money given for the removal of the slaves to Africa, and their preferment there, is a good charity, under the common law and our statute.
 

 The trust in this case must therefore be declared valid; and the Colonization Society authorised to receive the slaves, and the surplus of the estate, (after paying the costs of this suit,) for the purpose of removing them to Africa, as directed in the will. This direction, however, is necessarily dependent on a fact, to be ascertained by an enquiry; which is, wdiether the negroes, .who are adults, are -willing to go to Africa or not. This fact must be ascertained, that it may be seen whether the Society has capacity to acquire the negroes, or remove them, which, according to the terms of the charter, depends on the consent of the negroes themselves. Indeed, we are not sure that it would be proper to send them abroad against their will, even if there were no such restriction in the charter of the Society — since, if a slave has capacity to accept emancipation, it would seem that he must have the power also of refusing it, when the offer of his owner is upon the condition of his leaving the country, and when he is not compelled by law. But, however that may be, the gift being here to a corporation, with an express limitation on its capacities, it must Be considered that the testatrix knew that, and the disposition be construed, as if the provision of the will- required their consent — at least, that of such of them as
 
 *19
 
 are 'of years- of discretion. For those who are under, say the age of fourteen — -their parents 'may elect. If any adult should refuse to go, those refusing must, of necessity, be sold, and the proceeds will go into the residue for the benefit of those who will go — according to the last clause of the will, which excludes thh next of kin altogether, unless all the slaves should refuse' to go.
 

 If any of the children have no parents, or their parents should elect for them not to go, libdrty must be reserved to such children to make their election, when they shall arrive at the ago of fourteen. It appears, indeed, that the money remaining in the hands of the executor is partly the proceeds of the sale of one of the negroes, which was rendered necessary for the payments of debts. Of course, all those charities must depend, for their validity, on the power of the party who creates them, without doing injustice to creditors. Justice stands before generosity ; and the owner of a slave cannot defeat the rights of a creditor by manumitting the slave. The Colonization Society can therefore claim only the slaves which remain unsold, and can have, immediately, only such as may be willing to go.
 

 Per Curiam.
 

 Decree accordingly.